**SEATTLE AUDUBON SOCIETY, et al., Plaintiffs,**

v.

**James LYONS, in his official capacity as Assistant Secretary of Agriculture, et al., Defendants,**

and

**Washington Contract Loggers Association, et al., Defendant–Intervenors.**

**SAVE THE WEST, Plaintiff,**

v.

**James LYONS, et al., Defendants.**

**NATIVE FOREST COUNCIL, Plaintiff,**

v.

**Bruce BABBITT, et al., Defendants.**

**The SIERRA CLUB, Plaintiff,**

v.

**Michael ESPY, et al., Defendants.**

**Nos. C92–479WD, C94–758WD, C94–803WD and C94–820WD.**

United States District Court, W.D. Washington, at Seattle.

Dec. 21, 1994.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, Peggy Hennessy, Portland, OR, for Seattle Audubon Soc.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, for Washington Environmental Council, Pilchuck Audubon Soc., Nat. Audubon Soc., Portland Audubon Soc., The Wilderness Soc., Headwaters, Klamath Forest Alliance, Northcoast Environmental Center.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, Michael D. Axline, Western Environmental Law Center, Eugene, OR, for Lane County Audubon Soc.

Todd D. True, Victor M. Sher, Sierra Club Legal Defense Fund, Seattle, WA, Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, Peggy Hennessy, Portland, OR, for Forest Conservation Council.

Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, Peggy Hennessy, Portland, OR, for Save the West.

John S. Karpinski, Vancouver, WA, Stephen M. Truitt, Washington, DC, for Native Forest Council.

Gregory Thomas Costello, Riddell, Williams, Bullitt & Walkinshaw, Seattle, WA, for The Sierra Club.

Payton Smith, Davis Wright Tremaine, Seattle, WA, for Cal. Forestry Ass'n.

Christopher Lee Pickrell, U.S. Attys. Office, Seattle, WA, Beverly Sherman Nash, Stephen J. Odell, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, for James R. Moseley, U.S. Forest Service.

Christopher Lee Pickrell, U.S. Attys. Office, Seattle, WA, Wells D. Burgess, U.S. Dept. of Justice, Environment and Natural Resources Div., Washington, DC, for Michael Espy.

Mark C. Rutzick, Law Offices of Mark C. Rutzick, Portland, OR, for Wash. Contract Loggers Ass'n, Burgess Logging Co. Inc., Lone Rock Timber Co. Inc., Jackie Bryan Cox, Freres Lumber Co. Inc., Norman V. Persons, A. Troy Reinhart, Gregory A. Miller.

John James Leary, Jr., James R. Hennessey, Smith & Leary, Seattle, WA, Mark C. Rutzick, Law Offices of Mark C. Rutzick, Portland, OR, for Northwest Forest Resource Council.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT RE 1994 FOREST PLAN

DWYER, District Judge.

### I. INTRODUCTION

The legality of a forest management plan adopted by the Secretaries of Agriculture and Interior must be decided in these consol-

idated cases. Among the federal lands in Washington, Oregon, and Northern California are about twenty-four million acres that are within the geographic range of the northern spotted owl. The plan to manage this large area was adopted in response to orders entered in this litigation (*see Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1484 (W.D.Wa.1992), *aff'd sub nom., Seattle Audubon Soc'y v. Espy,* 998 F.2d 699 (9th Cir. 1993), and in the District of Oregon (*see Portland Audubon Soc'y v. Lujan,* 795 F.Supp. 1489 (D.Or.1992), *aff'd sub nom., Portland Audubon Soc'y v. Babbitt,* 998 F.2d 705 (9th Cir.1993)). The Secretaries and their departmental agencies—the United States Forest Service and the Bureau of Land Management ("BLM")—submit that the new plan, jointly adopted following a final supplemental environmental impact statement ("FSEIS") by a record of decision ("ROD") issued on April 13, 1994, satisfies all requirements of statutory and regulatory law.

The plan is challenged from two sides. Seattle Audubon Society ("SAS") and several other environmental groups (the "plaintiffs") contend that compliance with the environmental laws is still inadequate. They seek an order remanding the matter to the agencies for further analysis and explanation, with an injunction against all or nearly all timber sales in the meantime.

On the other side is the Northwest Forest Resource Council ("NFRC"), an association representing loggers, mill owners, and others in the timber industry. NFRC has been an intervenor-defendant in the first-filed of these cases (No. C92–479WD) since 1992, but brought its challenges to the 1994 plan in two suits filed, with industry co-parties, in the United States District Court for the District of Columbia, *Northwest Forest Resource Council v. Thomas* and *Northwest Forest Resource Council v. Dombeck* (Civil Nos. 94–1032 (TPJ) and 94–1031 (TPJ) in that court). The industry challenges to the plan are interrelated with those of the environmental plaintiffs. The court in the District of Columbia transferred the *Thomas* case to this district, and stayed the *Dombeck* case, so that the issues could be decided here and

duplicative litigation avoided. When NFRC voluntarily dismissed the transferred case without prejudice, this court allowed the federal defendants to cross-claim against NFRC for declaratory relief on its claims of illegality asserted in the *Thomas* and *Dombeck* complaints. That ruling permits both sides' challenges to the 1994 forest plan to be decided together. If NFRC's contentions were upheld against the cross-claims for declaratory judgment, the result would be a remand to the agencies.

The plaintiffs and the federal defendants have moved for summary judgment. There are no issues for trial and, under the provisions of Fed.R.Civ.P. 56, summary judgment is appropriate.

For the reasons given below, the court finds that the federal defendants have acted within the lawful scope of their discretion in adopting the 1994 forest plan. The question is not whether the court would write the same plan, but whether the agencies have acted within the bounds of the law. On the present record, the answer to that question is yes.

The order now entered, if upheld on appeal, will mark the first time in several years that the owl-habitat forests will be managed by the responsible agencies under a plan found lawful by the courts. It will also mark the first time that the Forest Service and BLM have worked together to preserve ecosystems common to their jurisdictions.

The Secretaries have noted, however, that the plan "will provide the highest sustainable timber levels from Forest Service and BLM lands of all action alternatives that are likely to satisfy the requirements of existing statutes and policies." ROD at 61. In other words, any more logging sales than the plan contemplates would probably violate the laws. Whether the plan and its implementation will remain legal will depend on future events and conditions. These are described below.

## II. HISTORY OF THE CONTROVERSY

The background and history of the legal struggle over management of the federal forests that are home to the northern spotted

owl are described in *Seattle Audubon Soc'y v. Evans,* 771 F.Supp. 1081 (W.D.Wa.1991), *aff'd,* 952 F.2d 297 (9th Cir.1991).

After decades of logging and development, perhaps ten percent of the original old growth forest remains. *See Evans,* 771 F.Supp. at 1088. The owl is an indicator species under 36 C.F.R. § 219.19. Its waxing or waning is a viability measure for other wildlife—for an ecosystem—in the remaining old growth.

In 1988 the Forest Service adopted a plan for management of the owl forests within its jurisdiction. Environmental and industry groups sued in this court, challenging the plan's legality. While the case was pending, the United States Fish & Wildlife Service ("FWS") announced on April 25, 1989, its intent to list the owl as "threatened" under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* Soon afterward, Congress enacted a temporary statute, which became law on October 23, 1989, directing the Forest Service and the BLM to offer specified quantities of timber for sale in fiscal years 1989 and 1990. The statute, known as section 318, was based upon wildlife viability assumptions that the federal agencies later recognized were false; if logging continued at the levels mandated, some vertebrate species would vanish from the federal forests.

In May 1990 an interagency scientific committee ("ISC") proposed a plan for conservation of the spotted owl. In October of that year the Forest Service published a notice that future timber sales would be consistent with the ISC recommendation; but the notice did not adopt standards and guidelines for the management of the owl under procedures required by the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* and was not accompanied by an environmental impact statement as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*

The legal adequacy of the 1989 notice was challenged. On March 7, 1991, this court entered an order declaring unlawful the Forest Service proposal to log spotted owl habitat without complying with statutory requirements. *See Seattle Audubon Soc'y v. Evans,* 771 F.Supp. at 1082–83. Following an eight-day evidentiary hearing on the scope of injunctive relief, the court issued an injunction protecting owl habitat from further timber sales pending the Forest Service's adoption of a management plan in compliance with NFMA. *Id.* at 1096.

In January 1992, the Forest Service published a supplemental EIS, and in March of that year it adopted an ROD establishing guidelines for managing spotted owl habitat. SAS and co-plaintiffs filed Cause No. C92–479WD challenging the adequacy of the ROD and EIS; NFRC and other industry parties became intervenor defendants.

On May 28, 1992, following briefing and a hearing, the court found that the new ROD and EIS violated NEPA in three ways. *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1473 (W.D.Wa.1992), *aff'd sub nom. Seattle Audubon Soc'y v. Espy,* 998 F.2d 699 (9th Cir.1993). The agency was enjoined to prepare a new or supplemental EIS curing these defects and, in the meantime, to refrain from awarding additional timber sales in Regions 5 and 6 that would log suitable habitat for the northern spotted owl. *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1484, 1493–94, (W.D.Wa.1992), *aff'd,* 998 F.2d 699 (9th Cir. 1993). A schedule for compliance was set (*Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. 1494 (W.D.Wa.1992), *aff'd,* 998 F.2d 699 (9th Cir.1993)), and was later extended at the agency's request to accommodate planning needs.

Litigation involving the BLM forests followed a similar course. In October 1987 environmental plaintiffs sued in the United States District Court for the District of Oregon, alleging that the BLM's refusal to prepare a supplemental EIS regarding a plan to log owl habitat in forests managed by it violated NEPA and other statutes. On May 18, 1989, the district court found that the agency's decision not to prepare a supplemental EIS was arbitrary, capricious, and an abuse of discretion. *Portland Audubon Soc'y v. Lujan,* 712 F.Supp. 1456, 1485 (D.Or. 1989). The court concluded, however, that a section of the Department of the Interior and Related Agencies Appropriation Act barred plaintiffs' challenge to the BLM's decision.

*Id.* at 1488–89. On June 22, 1992, after the expiration of that section, the district court in Oregon again ruled that the BLM had violated NEPA, and enjoined it from making further timber sales in spotted owl habitat pending completion of a supplemental EIS. *Portland Audubon Soc'y v. Lujan,* 795 F.Supp. 1489 (D.Or.1992), *aff'd sub nom. Portland Audubon Soc'y v. Babbitt,* 998 F.2d 705 (9th Cir.1993).

Shortly before the 1994 plan was adopted, the injunction in this court barring additional Forest Service sales was modified by the granting of a motion, unopposed by most of the parties, to release twenty-four sales. Order on Defendants' Motion for Modification of Injunction (March 24, 1994) (Dkt. # 418). After the plan was adopted, the injunction was vacated, again with no opposition by most parties, in an order noting that "[t]he legality of the new plan should be tested in proceedings directed to it, without the presence of an injunction whose purpose has been served." Order Dissolving Injunction, Etc. (June 6, 1994) (Dkt. # 466). By stipulation, the order called for thirty days' written notice to all parties in advance of any proposed new timber sale that would log spotted owl habitat. *Id.*

## III. SUMMARY OF APPLICABLE STATUTES AND REGULATIONS

Congress has mandated several uses for the national forests and BLM lands.

The Multiple–Use Sustained–Yield Act of 1960 ("MUSY"), 16 U.S.C. § 528 *et seq.,* declares "that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. MUSY recognizes that "some land will be used for less than all of the resources." 16 U.S.C. § 531(a).

The National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.,* adopted in 1976, sets out further requirements. It directs the Forest Service to manage the national forests so as to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B).

The NFMA implementing regulations provide that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19.

The regulations also direct that forest planning "recogni[ze] that the National Forests are ecosystems and their management for goods and services requires an awareness and consideration of the interrelationships among plants, animals, soil, water, air and other environmental factors within such ecosystems." 36 C.F.R. § 219.1(b)(3). The regulations incorporate the statutory requirement that forest planning provide for multiple uses and sustained yield "in a way that maximizes long-term net public benefits in an environmentally sound manner." 36 C.F.R. § 219.1(a).

The BLM is steward of public lands governed by the Oregon and California Railroad and Coos Bay Wagon Road Lands Act ("O & CLA"), 43 U.S.C. §§ 1181a—1181j, and the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* O & CLA applies to certain lands revested in the United States after earlier conveyances to a railroad, and provides that they "shall be managed ... for permanent forest production" and "in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties." 43 U.S.C. § 1181a.

FLPMA, adopted later, declares as policy that the BLM lands shall be managed "on the basis of multiple use and sustained yield unless otherwise specified by law," and "in a manner that will protect the quality of scientific, scenic, historical, ecological, air and atmospheric, water resource, and archeological values." 43 U.S.C. §§ 1701(a)(7) and (8). It directs the Secretary of the Interior, in developing and revising land use plans, to "observe the principles of multiple use and sustained yield;" to "achieve integrated consideration of physical, biological, economic, and

other sciences;" and to "give priority to the designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c).

All federal agencies must observe the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* NEPA requires that impacts of "major Federal actions significantly affecting the quality of the human environment" be considered and disclosed in an environmental impact statement. 42 U.S.C. § 4332(2)(C). The Council on Environmental Quality ("CEQ"), established by NEPA, issues regulations for NEPA compliance. 42 U.S.C. § 4342 *et seq.*

The Forest Service and BLM must comply also with the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.* Section 7(a)(1) of ESA requires that federal agencies carry out their programs so as to conserve species listed as threatened or endangered under the statute. 16 U.S.C. § 1536(a)(1). *See also* 16 U.S.C. § 1531(b) (one purpose of ESA is to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved"); 16 U.S.C. § 1532(3) (defining "conserve" as meaning the use of "all methods and procedures which are necessary" to bring listed species to the point of recovery).

Section 7(a)(2) of ESA requires federal agencies to insure that their actions are not likely to jeopardize the continued existence of a listed species, or to result in destruction or adverse modification of habitat that FWS has designated as "critical" for such a species. 16 U.S.C. § 1536(a)(2). Agencies must therefore consult with FWS, before acting, to assess the effects on listed species or critical habitat. *Id.*

The agencies are also subject to the Clean Water Act ("CWA"), 33 U.S.C. § 1311 *et seq.*, which mandates compliance with state requirements to restore and maintain water quality necessary for purposes of water supply, recreation, and protection of fish, shellfish, and wildlife.

## IV. PROCEDURE USED TO DEVELOP PLAN

The FSEIS and ROD are the result of a massive effort by the executive branch of the federal government to meet the legal and scientific needs of forest management. They reflect unprecedented thoroughness in doing this complex and difficult job.

The first step was a conference held at Portland, Oregon, on April 2, 1993. In attendance were the President, Vice President, several members of the Cabinet, loggers, mill-owners, environmentalists, labor leaders, local government officials, scientists, economists, Native American tribal representatives, and others. Information and views were exchanged.

After the conference the administration established three working groups. The Forest Ecosystem Management Assessment Team ("FEMAT") was organized to conduct a conservation and management assessment of all federal forests within the range of the northern spotted owl. A second group dealt with economic development and assistance, and a third with agency coordination.

FEMAT was an interagency, interdisciplinary team of scientists, economists, sociologists, and other experts. Its chairman was Dr. Jack Ward Thomas, a Forest Service biologist. FEMAT was asked to develop a set of options for management of all federal forests within the owl's range that would comply with existing laws, maintain biological diversity, provide for sustainable levels of timber harvest, and support rural economies and communities.

To carry out this task FEMAT reviewed earlier plans and proposals and developed fifty-four alternatives which were evaluated against ecological criteria. This process resulted in the selection of thirty-five for a more detailed review. Further analysis led to ten alternatives chosen for final intensive assessment.

FEMAT assessed the predicted effects of the ten options on more than a thousand animal and plant species for the next century—an unparalleled effort.

The ten final alternatives vary in four main respects: the quantity and location of land placed in some type of reserve; activities permitted within reserve areas; delineation of areas outside the reserves; and prescrip-

tions for those areas. The alternatives range from one that calls for 11.4 million acres of late successional old-growth ("LSOG") reserves to one that calls for 5.4 million acres. The projected probable timber sale quantities range from 100 million board feet (Alternative 1, which would preserve nearly all remaining LSOG) to 1.8 billion board feet (Alternative 7).

Two tables summarizing the main features of the ten alternatives, published in the ROD, are reproduced as Appendices A and B to this order.

Initially considered, but not selected for intensive assessment, was a "no-action" alternative based upon the management direction in effect in July 1990. Because of changed conditions, the "no-action" alternative was found insufficient to meet legal requirements.

In May 1993 the Secretaries directed the Forest Service and BLM to begin preparing, in cooperation with the Fish & Wildlife Service, National Park Service, National Marine Fisheries Service, and Environmental Protection Agency, a joint draft supplemental EIS to assess the environmental effects of the ten options FEMAT was preparing, and to provide for public participation in accordance with NEPA.

On July 28, 1993, the agencies published a Draft Supplemental Environmental Impact Statement on Management of Habitat for Late–Successional and Old–Growth Forest Related Species Within the Range of the Northern Spotted Owl ("DSEIS"), 58 Fed. Reg. 40444–40445 (July 28, 1993). The DSEIS presented the alternatives FEMAT had chosen for intensive assessment; identified Alternative 9, endorsed by the President on July 1, 1993, as the preferred alternative; summarized the analysis given in the FEMAT report; and attached the FEMAT report as an appendix.

The interagency team that prepared the DSEIS received more than 100,000 comments on it during the ninety-day comment period. The Departments of Agriculture and Interior sponsored public hearings at Olympia, Washington; Salem, Oregon; and Redding, California. In response to comments and agency concerns, the interagency team did further analysis on cumulative impacts on several hundred species; changed the preferred alternative to furnish additional protection to LSOG forests; did more analysis of predicted employment effects; explained the rejection of proposals for further analyses; examined information that came into existence after publication of the DSEIS, including the most recent owl demographic data; and requested and financially sponsored the running of a computer model to simulate owl population dynamics.

The Forest Service and BLM published the FSEIS in February 1994. They provided an additional thirty-day period for public comment. See 59 Fed.Reg. 9210 (Feb. 25, 1994); 59 Fed.Reg. 9992 (Mar. 2, 1994). The interagency team received comments and summarized them. Partly in response to those comments, the ROD reflects changes from the version of Alternative 9 presented in the FSEIS.

## V. DESCRIPTION OF THE AGENCIES' ADOPTED STRATEGY

In adopting the ROD on April 13, 1994, the Secretaries jointly amended the planning documents of two Forest Service regions, nineteen national forests, and seven BLM districts. The ROD selects, with minor modifications, Alternative 9 of the FSEIS as management direction for the habitat of LSOG forest-related species within the range of the owl. The plan sets standards and guidelines only for lands administered by the Forest Service or BLM. Management of other federal lands (e.g., national parks) is not affected.

Of the 24.5 million federal acres within range of the northern spotted owl, 19.4 million are administered by the Forest Service, 2.7 million by the BLM, and 2.2 million by the National Park Service. The remainder of about 200,000 acres includes military installations and national wildlife refuges. Of the total, about 20.6 million acres are forested, including about 7.4 million acres of suitable habitat for the northern spotted owl.

The plan has four main components. First, it designates reserve areas in which logging and other ground-disturbing activi-

ties are generally prohibited to protect the ecosystem and conserve the owl and other species. Second, it designates the unreserved areas as "matrix," in which timber harvest may go forward subject to environmental requirements. Third, it adopts an aquatic conservation strategy which, among other things, overlays the reserve areas and matrix with a system of key watersheds where activities are restricted to conserve aquatic species. Fourth, it creates a monitoring and evaluation program, and allocates six percent of the lands to adaptive management areas near communities affected by the reduction in timber sales. In the adaptive management areas, new ways to achieve ecological and economic goals will be tried.

The acreage allocation in the planning area, by type of land use, is as follows:

| | |
|---|---|
| Late-successional reserves | 7,430,800 |
| Congressionally reserved areas | 7,320,600 |
| Administratively withdrawn areas | 1,477,100 |
| Riparian reserves | 2,627,500 |
| Adaptive management areas | 1,521,800 |
| Managed late-successional areas | 102,200 |
| Matrix | 3,975,300 |
| TOTAL | 24,455,300 |

Congressionally-reserved areas are those already set aside by Congress, such as national parks and monuments. Administratively withdrawn areas are those already identified as not scheduled for timber harvest for various reasons. Managed late-successional areas are those designated for special measures because of frequent fires.

The reserve areas taken together (including late-successional reserves, congressionally reserved areas, administratively withdrawn areas, and riparian reserves) protect about eighty percent of the remaining LSOG forest acres in the planning area from programmed timber harvest. Limited thinning and salvage operations are permitted in the Forest Service and BLM reserves where they would promote LSOG conditions, subject to review by interagency bodies.

Compared to Alternative 1, which would preserve nearly all the remaining LSOG, Alternative 9 has about 1.3 million fewer reserve acres. Compared to Alternative 7, which projects the likely results of prior management directives now deemed inade-

quate, Alternative 9 has about 4 million more reserve acres.

Additional provisions are made for the spotted owl and marbled murrelet, both listed as threatened under ESA. (*See* 55 Fed. Reg. 26114 (June 26, 1990) and 57 Fed.Reg. 45328 (October 1, 1992)). One hundred acres are protected around each known owl activity center in the matrix and adaptive management areas. A band extending from ten miles to forty miles inland in California, Oregon, and Washington, is designated as a marbled murrelet zone with additional guidelines to protect the bird's habitat. A broader murrelet zone is established for survey and nest-site protection purposes.

With respect to certain other rare plant and animal species, land managers are required to protect known sites and to check for the presence of specimens before conducting any ground-disturbing activities.

The Fish & Wildlife Service has issued a biological opinion determining that the plan is not likely to jeopardize the continued existence, or destroy or adversely modify critical habitat, of any listed species.

The aquatic conservation strategy ("ACS") is directed to the aquatic ecosystem, water quality, and fish habitat. It establishes key watersheds to afford refugia for at-risk fish species and stocks; adopts watershed analysis as a basis for monitoring; and provides for watershed restoration on a long-term basis. All 24.5 million acres of Forest Service, BLM, and other federally-administered lands within the range of the owl are allocated to one of three watershed categories, with graduated levels of regulation. No logging or other major resource activities can be undertaken in a key watershed until watershed analysis has been conducted.

The matrix comprises about 3.8 million acres, or sixteen percent, of the lands in the planning area. Timber sales can be offered in the matrix. There must be compliance with NEPA, ESA, and other laws and regulations, and opportunities for administrative appeals of site-specific decisions that would have environmental consequences.

The agencies estimate that the plan, when fully implemented, will yield about one billion

**1306**

board feet of timber per year. This represents a seventy-three percent reduction from the unsustainable average timber sale levels of the 1980s. Over the first decade, a maximum of about one quarter of one percent per year of owl habitat in the planning area could be logged.

A three-part monitoring process is adopted: implementation monitoring to determine whether the standards and guidelines are being followed; effectiveness monitoring to determine whether the desired results are being achieved; and validation monitoring to determine whether the plan's assumptions are sound. Supervision of monitoring is entrusted to an Interagency Steering Committee composed of representatives of the Secretary of the Interior, Secretary of Agriculture, Administrator of the EPA, the Under-secretary of Commerce for Oceans and the Atmosphere, and the White House Office on Environmental Policy. Regional oversight is to be provided by a Regional Interagency Executive Committee, which currently consists of the Pacific Northwest heads of the Forest Service, BLM, FWS, National Marine Fisheries Service, Bureau of Indian Affairs, and EPA. The ROD creates twelve "province analysis areas" to assure that monitoring will cross administrative boundaries. Monitoring and evaluation will be further assisted by a Research and Monitoring Committee composed of full-time federal scientists. The plan can be amended, if necessary, depending on the results of monitoring and other new information.

## VI. SUMMARY OF CHALLENGES TO FSEIS AND ROD

SAS and twelve other environmental organizations as co-plaintiffs [1] have sued the two Secretaries; James Lyons, Assistant Secretary of Agriculture; the Forest Service; and the BLM. SAS's claims are brought under

NEPA, NFMA, and the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 702, 706(2)(A).

The Sierra Club, in its complaint, makes the same claims as SAS.

Three other environmental plaintiffs who have sued separately—Native Forest Council, Forest Conservation Council, and Save the West—make the same claims plus others discussed below.

NFRC in its *Thomas* and *Dombeck* complaints, which are the subject of the federal defendants' cross-claims for declaratory judgment under 28 U.S.C. § 2201, asserts a variety of challenges under several statutes.[2] The cross-claims seek judgment declaring that the ROD and FSEIS meet the standard of review set forth in 5 U.S.C. § 706(2)—i.e., that the agency action cannot be set aside on the basis of NFRC's pleaded claims.

The challenges to the plan fall into four basic categories. First, there are challenges related to the Secretaries' use and interpretation of the wildlife viability provision. Second, the plaintiffs and NFRC contend that the agencies have failed to follow the requirements of NEPA in several respects. Among these claims are challenges to the agencies' analysis of new information, opposing opinion, and cumulative impacts. Third, NFRC asserts that the Secretaries lack statutory authority to adopt certain parts of the plan. Finally, NFRC and three environmental groups challenge certain procedures used to develop the strategy.

The plaintiffs and the federal defendants have filed cross-motions for summary judgment against each other, and the federal defendants in No. C92–479WD have moved for summary judgment against NFRC de-

1. SAS's co-plaintiffs are Washington Environmental Council, Pilchuck Audubon Society, National Audubon Society, Portland Audubon Society, Wilderness Society, Headwaters, Klamath Forest Alliance, Northcoast Environmental Center, Pacific Rivers Council, Western Ancient Forest Alliance, Lane County Audubon Society, and Oregon Natural Resources Council.

2. NFRC's co-intervenor defendants herein are still parties, and are represented by NFRC's counsel, but are not named in the cross-claims because they were not co-parties in *Thomas* and *Dombeck*. The co-intervenor defendants are Washington Contract Loggers Association, Burgess Logging Company, Inc., Lone Rock Timber Company, Inc., Jackie Bryan Cox, Freres Lumber Company, Inc., Norman V. Persons, A. Troy Reinhart, and Gregory A. Miller.

claring its *Thomas* and *Dombeck* claims to be invalid.[3]

## VII. JURISDICTION, VENUE, STANDING, AND RIPENESS

The court has jurisdiction in these cases under 28 U.S.C. § 1331.

The requirements of standing to sue and ripeness as to the plaintiffs' claims have been held satisfied in an appeal from an earlier order in C92–479WD. *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 702–03 (9th Cir.1993).

Jurisdiction, standing, ripeness, and venue as to the federal defendants' cross-claims for declaratory judgment against NFRC in No. C92–479WD have been confirmed in earlier orders. *See* Order Granting Leave to Federal Defendants to Amend Answer to Assert Cross–Claims, Denying Motion to Join Additional Parties, and Making Other Provisions (Aug. 5, 1994) (Dkt. # 526); Order on NFRC's Motions to Dismiss Cross–Claims, Obtain a More Definite Statement, to Strike, and to Transfer (Oct. 12, 1994) (Dkt. # 690).

■ The forest plan under review is programmatic—that is, it sets the ground rules for managing certain public lands. The plaintiffs and NFRC have standing to sue on the claims they have pleaded; their members are users of these federal forests. To confine judicial review to individual, site-specific actions that would come later—to each timber sale, for example—rather than decide the legality of the plan itself, would be wholly impractical. As the Ninth Circuit has noted, "if plaintiffs did not have standing to challenge a non-site-specific EIS, the program as a whole could never be reviewed." *Resources Ltd., Inc. v. Robertson*, 8 F.3d 1394, 1397 (9th Cir.1993).

At an earlier stage of this litigation the court of appeals stated:

> [T]he threatened harm to owl viability resulting from further logging in old-growth forests, in the absence of an owl management plan which complies with the requirements of NEPA and the NFMA, is concrete, specific, imminent, caused by agency conduct in question, and redressable by a favorable ruling.

*Seattle Audubon Soc'y v. Espy*, 998 F.2d at 703. *See also Idaho Conservation League v. Mumma*, 956 F.2d 1508 (9th Cir.1992); *Lane County Audubon Soc'y v. Jamison*, 958 F.2d 290 (9th Cir.1992).

The requirements of jurisdiction, venue, standing to sue, and ripeness are met.

## VIII. STANDARD OF REVIEW, ADEQUACY OF ADMINISTRATIVE RECORD, FACA VIOLATIONS

### A. *Standard of Review*

■ The court in reviewing a challenged administrative action determines whether the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or was taken without observance of procedures required by law. *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 980–81 (9th Cir.1985); 5 U.S.C. § 706(2)(A). The standard is narrow and presumes the agency action is valid. *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976). While the court may not substitute its judgment for that of the agency, it should subject the action to a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

### B. *Effect of Seeking Declaratory Judgment*

■ NFRC contends that the usual standard for reviewing agency action should

---

**3.** Two claims by NFRC are not addressed by the federal defendants' summary judgment motion. These are NFRC's claims that the ROD would establish a regional interagency executive committee, and other committees known as province teams, not composed wholly of full-time officers or employees of the federal government, without complying with the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. 2 (1988). The absence of a motion by the government presumably implies a recognition that NFRC is correct. If so, the defect does not go to the plan's overall legality and can be remedied by an administrative amendment. In the absence of a summary judgment motion, no ruling is made now as to these two claims.

be altered because the agencies are seeking a declaratory judgment; the burden, NFRC argues, should be on the government because of this state of the pleadings. But in a declaratory judgment case the question of who has the burden of proof is governed not by the formal position of the parties but by the nature of the relief sought. *Pacific Portland Cement Co. v. Food Mach. & Chem. Corp.*, 178 F.2d 541, 546 (9th Cir.1949). NFRC has pleaded, in *Thomas* and *Dombeck*, that the plan is illegal. It is only as to those claims that the federal defendants seek a declaratory judgment. The burden of showing illegality remains on NFRC. The outcome, on the present record, would be no different if the burden were reversed.

### C. Administrative Record

There is a voluminous administrative record concerning the Secretaries' decision of April 13, 1994. The decisional documents— the ROD and FSEIS with appendices— themselves total more than 4,000 pages. They spell out in detail the alternatives, the reasons for the decision, and the supporting analysis. The rest of the record is contained in twenty boxes, the index to which alone has nearly 4,000 pages with about 100,000 record items.

### D. Declarations Outside Record

▮ The focal point for judicial review is the administrative record in existence, not a new record made initially in the reviewing court. *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1159 (9th Cir.1980). Evidence outside the record may be considered for certain limited purposes, e.g., to explain the agency's action or to determine whether its course of inquiry was inadequate. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir.1988), *cert. denied*, 490 U.S. 1035, 109 S.Ct. 1932, 104 L.Ed.2d 403 (1989); *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir.1988).

The federal defendants request that certain declarations filed by SAS be disregarded. In substance this is a motion to strike. The motion is denied; these declarations, and those filed by other parties including the federal defendants, are properly considered for the limited purposes mentioned above.

### E. Adequacy of Administrative Record

Document and deposition discovery as to the composition and completeness of the administrative record was allowed, and production of still-extant electronic communications was ordered. *See, e.g.,* the discovery orders at Dkt. ## 579, 606. A late-filed motion by NFRC for additional discovery was granted in part, and the schedule adjusted to accommodate it. (Dkt. # 700.) No justification for additional discovery has been shown.

While the administrative record contains what the Secretaries relied upon in making their decision, many documents generated earlier were not preserved. Members of the FEMAT and FSEIS teams were told to retain documents material to the decision, but were left free to discard others, largely in their own discretion. Thousands of pages of notes, memoranda, and other working documents and electronic communications were destroyed. The record as it stands, however, includes many documents reflecting dissenting opinions and a variety of views on all subjects.

▮ Citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993), SAS asks the court to presume that the destroyed documents were adverse to the government. For such a presumption to arise, it must be shown that the party had notice that the documents were relevant; that has not been shown here, nor is there proof of any ulterior motive. *See Allen Pen Co., Inc. v. Springfield Photo Mount Co., Inc.*, 653 F.2d 17, 23–24 (1st Cir.1981); *Nation–Wide Check Corp., Inc. v. Forest Hills Distrib., Inc.*, 692 F.2d 214, 218–19 (1st Cir.1982).

▮ NFRC, citing *Portland Audubon Soc'y v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir.1993), for the proposition that an incomplete record must be viewed as a "fictional account of the actual decision-making process," seeks to vacate the FSEIS and ROD.

▮ The record here, however, is sufficient to show the decision-making process and to permit judicial review under the APA. *See Sears Savings Bank v. Federal Savings*

& Loan Ins. Corp., 775 F.2d 1028, 1029 (9th Cir.1985). That additional documents might provide a fuller record makes no difference if the record as it exists is adequate. *Friends of the Earth v. Hintz*, 800 F.2d 822, 829 (9th Cir.1986). This is true even though portions of the administrative record may have been destroyed. *See Hurst v. U.S. Postal Service*, 586 F.2d 1197, 1200 (8th Cir.1978). Personal files and notes are not required to be contained in an administrative record. *See National Wildlife Federation v. Burford*, 677 F.Supp. 1445, 1457 (D.Mont.1985); *Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1456 (1st Cir.1992).

Since the administrative record is legally sufficient, the absence of some documents that could have been included does not justify invalidating the agency action or changing the standard of review.

### F. *FACA Violations*

■ One party on each side—NFC and NFRC—contend that the federal defendants' violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C.App. 2 (1988), in the establishment and operation of FEMAT require invalidation of the plan. In general, the President or a Cabinet officer may listen to advice from any person. FACA, however, applies to an "advisory committee" or similar group that is "established or utilized" by the President or a federal agency "in the interest of obtaining advice or recommendations." 5 U.S.C.App. 2 § 3(2). It does not apply to committees composed wholly of federal employees. *Id.* Most, but not all, of FEMAT's members were government employees; some were non-federal scientists. NFRC sued the Secretaries and other defendants for relief under FACA in the United States District Court for the District of Columbia. The defendants resisted on the ground, among others, that FEMAT was not an "advisory committee" within the meaning of the statute. The court held that the "uncomfortably broad statute" indeed applied. *Northwest Forest Resource Council v. Espy*, 846 F.Supp. 1009, 1010 (D.D.C.1994). This ruling came several months after FEMAT had delivered its report and twenty-four days before this court's deadline for filing a legally sufficient management plan. The District of Columbia court granted declaratory relief that FEMAT was convened and did its work in violation of FACA requirements including those of open meetings, making records publicly available, keeping detailed minutes, and being constituted, in the first place, with a balanced membership and pursuant to filed advisory committee charter. But the court declined to order injunctive relief, stating:

> Finally, plaintiff seeks an order enjoining the Administration from relying upon the FEMAT report to promulgate regulations implementing its Forest Plan. Such an injunction is, of course, the relief of which plaintiff is most desirous. In the Court's opinion, however, such an injunction would exceed the injury presently to be redressed. There is nothing in the record to suggest that the FEMAT Report, or its advice and recommendations to the President, would have in any way been altered had FACA been complied with to the letter.

*Id.* at 1015.

Accordingly, noting also that the question of an injunction was premature and that a constitutional question could be raised, the court awarded declaratory relief only, stating that the "effect and consequences of that judgment will be left to other courts and/or other cases." *Id.*

■ FACA can and should be enforced by injunctive relief during the process; that is, by an order requiring that a proposed or existing committee comply with the statute. But once a committee has served its purpose, courts generally have not invalidated the agency action even if there were earlier FACA violations. As Judge Friendly wrote for the Second Circuit in *National Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2nd Cir.1979):

> So far as we are aware, no court has held that a violation of FACA would invalidate a regulation adopted under otherwise appropriate procedures, simply because it stemmed from the advisory committee's recommendations, or even that pending rulemaking must be aborted and a fresh start made. We perceive no sound basis for doing so. Applicable rulemaking pro-

cedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to the proposal.

*See also Center for Auto Safety v. Tiemann,* 414 F.Supp. 215, 226 (D.D.C.1976), *remanded on other grounds,* 580 F.2d 689 (D.C.Cir.1978) (availability of a subsequent opportunity for comment and for review of the final regulation under the Administrative Procedure Act cures a FACA violation); *Washington Legal Foundation v. Dept. of Justice,* 691 F.Supp. 483, 495–96 (D.D.C. 1988), *aff'd sub nom., Public Citizen v. Dept. of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (public accountability aspects of FACA satisfied by subsequent opportunity to question).

NFC and NFRC rely upon a recent Eleventh Circuit case, *Alabama–Tombigbee Rivers Coalition v. Dept. of Interior,* 26 F.3d 1103 (11th Cir.1994), enjoining the use of an advisory committee report where FACA had been violated. In that case, however, the plaintiffs obtained a temporary restraining order *before* the report was distributed and used by the government. The court noted, in exercising its "broad equitable power," that "other Circuits have affirmed the denial of injunctive relief requested as a result of FACA violations," based on the "individual facts of the cases before them." *Id.* at 1107 and 1106 n. 8. *Alabama–Tombigbee* would not require automatic invalidation of the agency action, and can be reconciled with the more numerous cases denying injunctive relief.

The record here makes clear that the government should not be enjoined from relying upon the FEMAT report. The ROD shows that the Secretaries recognized the District of Columbia court's ruling, accepted it, and elected to proceed for valid reasons. *See* ROD at 52–53. They concluded, in agreement with the court, that the FEMAT recommendations would have been the same had there been full compliance with FACA. The FEMAT report was circulated during the ninety-day public comment period and was subjected to public comments and criticisms, including those by NFRC. The Secretaries decided that the "consultation and decision-making process has, taken as a whole, satisfied the objectives of FACA." ROD at 53.

Here, as in *National Nutritional, supra,* the "procedures afford[ed] ample opportunity to correct infirmities." The findings in *Northwest Forest Resource Council v. Espy* do not justify vacating the ROD or altering the standard of review.

## IX. SUBSTANTIVE CHALLENGES

For convenience, this order divides the challenges to the plan into "substantive" and "procedural" categories. Where there is overlap—for example, where parties make similar arguments under both NFMA and NEPA—the discussion applies to both categories to the extent relevant to both.

### A. *Authority to Adopt an Interagency Plan on an Ecosystem Basis*

As of early 1993, repeated violations of environmental laws by the Forest Service and BLM had led to court injunctions barring further logging sales in spotted owl habitat areas pending compliance with the laws. The agencies for years had operated independently and sometimes in conflict. In the current plan they have cooperated and have analyzed not just individual species but ecosystems. NFRC, noting that agency action may not contravene statutes and regulations, *see Dilley v. Alexander,* 603 F.2d 914, 920 (D.C.Cir.1979), challenges this approach.

█ As for ecosystem planning, the FSEIS states:

The agencies must take an ecosystem management approach to forest management, with support from scientific evidence, and meet the requirements of existing laws and regulations.

FSEIS at S–4.

█ NFMA "requires planning for the entire biological community—not for one species alone." *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. at 1483. The regional standards and guidelines must consider the effects on other old-growth species, and the subject cannot be put off until individual forest plans are developed. *Seattle Audubon Soc'y v. Espy,* 998 F.2d at 704.

Both agencies' planning statutes require them to utilize "a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic and other sciences." 16 U.S.C. § 1604(b); 43 U.S.C. § 1712(c)(2).

Both agencies' activities must also comply with NEPA. 42 U.S.C. § 4321 *et seq.* Regulations implementing NEPA call upon agencies, when conducting their assessments, to consider "ecological" effects "such as the effects on ... the components, structures, and functioning of affected ecosystems." 40 C.F.R. §§ 1508.8 and 1502.16.

In addition, the ESA requires federal agencies to carry out their administrative programs so as to conserve listed species and the ecosystems upon which they depend. 16 U.S.C. §§ 1531(b), 1536(a)(1).

Given the current condition of the forests, there is no way the agencies could comply with the environmental laws *without* planning on an ecosystem basis.

■ As for interagency cooperation, NFMA directs the Secretary of Agriculture to "coordinate" National Forest planning "with the land and resource planning processes of ... other Federal agencies." 16 U.S.C. § 1604(a). The Secretary of the Interior is directed by FLPMA to "coordinate ... land use inventory, planning and management activities ... with the land use planning and management programs of other Federal departments and agencies...." 43 U.S.C. § 1712(c)(9). The courts have repeatedly encouraged the Forest Service, the BLM, and FWS to turn from disparate strategies for managing LSOG forests to a cooperative approach. *See Seattle Audubon Soc'y v. Evans,* 771 F.Supp. at 1092–93; *Seattle Audubon Soc'y v. Evans,* 952 F.2d at 297, 302 (9th Cir.1991) ("The Forest Service will doubtless have to coordinate its planning efforts with other agencies such as the Fish and Wildlife Service and the Bureau of Land Management...."); *see generally Portland Audubon Soc'y v. Endangered Species Committee,* 984 F.2d 1534 (9th Cir.1993).

■ NFRC contends that the ecosystem approach violates the multiple use and sustained yield principles of MUSY and NFMA.

But conservation on this basis is entirely consistent with those principles. The plan designates millions of acres for programmed logging. As noted in an earlier decision, Congress's mandate for multiple uses, including both logging and wildlife preservation, can be fulfilled if the remaining old growth is left standing, but not if it is logged to the point where native vertebrate species are extirpated. *Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. at 1490.

■ NFRC also contends that the agencies acted arbitrarily and capriciously in trying to return the forests to an assumed pre-European-settlement level of about sixty-five percent old growth. The record does not support this contention. Scientific estimates of past conditions (as to diversity, ecological process, and connectivity) were used in evaluating the alternatives. FSEIS 2–68–69. But the FSEIS states:

In general, forest plantations, fire suppression, logging, ownership patterns, and human and environmental influences have altered the regional ecosystem on federal lands to the extent that none of the alternatives would provide for a return to conditions that closely match those of previous centuries. Site conditions across all landscapes will not return to their pre-settlement conditions within the next 100 years. However, all alternatives reverse the management trend of the last 50 years on federal lands, which, if continued, would have resulted in a steep decline in the quantity and quality of late-successional ecosystems and the eventual loss of these ecosystems in many federal planning areas.

FSEIS at 2–69.

Past conditions were used as "a reference point for current and future conditions, and to facilitate an understanding of the processes that lead to the development and maintenance of current late-successional ecosystems." FSEIS 3 & 4–42.

The Secretaries acted reasonably in taking this approach. There is adequate scientific support for their decision and adequate discussion of opposing views. *See, e.g.,* FSEIS at F–14–15.

There is also no merit to NFRC's claim that the Secretaries have acted illegally in trying to return the spotted owl to a historic range larger than its present range. The goal, recognizing that only a small fraction of old growth remains, was to comply with the laws based on current conditions.

■ NFRC also contends that the federal defendants have erred in using the owl's range as the geographic basis for planning for other species as well. To do this, however, was well within the agencies' discretion. The owl has long been an indicator species, and to plan based on different geographic boundaries for every species in the same ecosystem would be impractical.

■ Finally in this regard, NFRC argues that the agencies are estopped from adopting a plan that contradicts positions they took earlier in judicial proceedings. In the respects now relevant, the agencies' earlier arguments were rejected by the courts. The federal defendants are responding to court orders directing them to comply with the environmental laws. Under these circumstances, there can be no judicial estoppel. *See United States v. Mendoza,* 464 U.S. 154, 159–62, 104 S.Ct. 568, 571–74, 78 L.Ed.2d 379 (1984).

## B. *Effect of Sweet Home Decision*

■ NFC, FCC, and Save the West contend that the Secretaries have acted contrary to law in disregarding a recent decision of the United States Court of Appeals for the District of Columbia, *Sweet Home Chapter of Communities for a Great Oregon v. Babbitt,* 17 F.3d 1463 (D.C.Cir.1994). *Sweet Home,* these plaintiffs argue, undercuts an assumption upon which the ROD's biological assessment depends, i.e., some degree of ongoing protection of spotted owl habitat on nonfederal lands.

ESA, which applies to federal and nonfederal entities alike, makes it unlawful to "take" a species listed as threatened or endangered. The statute defines "take" as meaning "to harass, *harm,* pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16

U.S.C. § 1532(19) (emphasis added). An implementing regulation provides:

> "Harm" in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3. Thus, a private landowner may not destroy habitat so as to kill or injure an endangered or threatened species.

This regulation has been in effect for nineteen years, and its validity has been upheld by the United States Court of Appeals for the Ninth Circuit. In *Palila v. Hawaii Dept. of Land and Natural Resources,* 852 F.2d 1106, 1108 (9th Cir.1988), the court held:

> The Secretary's inclusion of habitat destruction that could result in extinction follows the plain language of the statute because it serves the overall purpose of the Act, which is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved...." 16 U.S.C. § 1531(b). The definition serves the overall purpose of the Act since it conserves the [species'] threatened ecosystem....
>
> The Secretary's construction of harm is also consistent with the policy of Congress evidenced by the legislative history.

In *Sweet Home,* a two-to-one panel in the District of Columbia reversed its own prior decision and held invalid the regulation defining "harm" to include habitat destruction. The word "harm" in the ESA, the court held, must be given a meaning consistent with its accompanying words in the statute, all of which "involve a substantially direct application of force, which the Service's concept of forbidden habitat modification altogether lacks." *Sweet Home,* 17 F.3d at 1465.

The Secretaries have responded to *Sweet Home* in the ROD as follows:

> We note the recent decision of the Court of Appeals for the District of Columbia in *Sweet Home Chapter of Communities for a Greater [sic] Oregon v. Babbitt,* [17 F.3d 1463 (D.C.Cir.1994) ]. The Secretary of

the Interior has filed a motion seeking to stay issuance of the mandate in this matter and has recommended requesting rehearing by the full Court of Appeals. The Secretary believes that the case is wrongly decided and, most importantly, that it is contrary to the law in the Ninth Circuit, as set out in *Palila v. Hawaii Department of Land and Natural Resources,* 852 F.2d 1106 (1988). Thus, we have determined that the *Sweet Home* decision has no impact on Alternative 9.

ROD at 69.

The petition for rehearing has since been denied, and a petition for review by the United States Supreme Court is pending.

The plaintiffs are correct that the ROD will have to be reconsidered if *Sweet Home* becomes applicable in the Ninth Circuit. The FSEIS assessment team recognized the need for nonfederal contributions to spotted owl recovery. *See* FSEIS at 3 & 4–244.

The argument that *Sweet Home* is now binding in the Ninth Circuit, however, is incorrect. Differences among the circuits are common, and the District of Columbia Circuit has no power to overrule another circuit's decision. As stated in *Johnson v. U.S.R.R. Retirement Board,* 969 F.2d 1082, 1093 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1842, 123 L.Ed.2d 467 (1993):

Although the decision of one circuit deserves respect, we have recognized that "it need not be taken by the [agency] as the law of the land." [Citation omitted.] When the [agency's] position is rejected by one circuit, after all, it should have a reasonable opportunity to persuade other circuits to reach a contrary conclusion.

*See also* Samuel Estreicher and Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies,* 98 Yale L.J. 679 (1989).

Here, a contrary conclusion has already been reached by the court of appeals whose rulings are binding on this court. The *Palila* case, upholding the FWS regulation, is the law of the Ninth Circuit until and unless changed by the Supreme Court or by the circuit itself.

It follows that the Secretaries did not act arbitrarily, or contrary to law, in concluding that *Sweet Home* requires no change in the ROD. If *Palila* ceases to be the law of the circuit, either because of Supreme Court review of *Sweet Home* or otherwise, the administrative decision under review will have to be reconsidered.

## C. O & CLA Lands

 NFRC contends that the Secretary of the Interior has acted contrary to law in his treatment of certain lands in Western Oregon that are subject to the O & CLA. These lands, comprising about 2.4 million acres, were ceded by the United States to a railroad in the nineteenth century, and later revested in the government. The ROD designates parts of them as late-successional and riparian reserves. It also creates key watersheds as refugia for at-risk fish stocks, and requires 150–year rotation periods and the retention of some late-successional forests in the matrix areas.

O & CLA, adopted in 1937, provides that the lands subject to it

shall be managed, except as provided in section 1181c of this title [since repealed], for permanent forest production, and the timber thereon shall be sold, cut and removed in conformity with the principal [sic] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facil[i]ties.

43 U.S.C. § 1181a.

In the case chiefly relied upon by NFRC, *Headwaters, Inc. v. BLM, Medford District,* 914 F.2d 1174 (9th Cir.1990), the court of appeals said that the plaintiff's proposal of "exempting certain timber resources from harvesting to serve as wildlife habitat" would be "inconsistent with the principle of sustained yield." *Id.* at 1183–84. In that case, however, the court approved a BLM land management plan allocating more than fifty percent of the management unit in question to non-timber uses, *id.* at 1183, and the decision dealt with O & CLA alone, not with the Secretary's duty to comply at the same time

with other applicable statutes. ESA directs the Secretary to review the programs administered by him, and utilize them in furtherance of ESA's purposes, and that each agency carry out "programs for the conservation of endangered species and threatened species listed...." 16 U.S.C. § 1536(a)(1). It requires also that all agencies insure that their actions will not be likely to jeopardize the continued existence of a listed species or cause the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). Federal agencies have "some discretion in ascertaining how best to fulfill the mandate to conserve under section 7(a)(1)." *Pyramid Lake Paiute Tribe of Indians v. Dept. of Navy,* 898 F.2d 1410, 1418 (9th Cir.1990).

Decisions more recent than *Headwaters* confirm that in managing the O & CLA lands the BLM must fulfill conservation duties imposed by other statutes. In *Portland Audubon Soc'y v. Lujan,* 795 F.Supp. at 1500–02, the court required the BLM to prepare supplemental environmental impact statements for timber management plans in Western Oregon to address new information regarding the presence of northern spotted owls. The court further held that O & CLA does not allow the BLM to avoid its conservation duties under NEPA or ESA, nor does it prevent injunctive relief when those duties have been breached. *Id.* at 1505–07. An injunction that prohibited logging on portions of O & CLA land was issued. *Id.* at 1510. In affirming the district court, the Ninth Circuit stated: "We find that the plain language of [O & CLA] supports the district court's conclusion that the Act has not deprived the BLM of all discretion with regard to either the volume requirements of the Act or the management of the lands entrusted to its care." *Portland Audubon Soc'y v. Babbitt,* 998 F.2d at 709.

NFRC cites *Platte River Whooping Crane Trust v. Federal Energy Regulatory Commission,* 962 F.2d 27 (D.C.Cir.1992), for the proposition that ESA does not empower an agency to do something (in that instance, imposing conditions on renewal hydroelectric power licenses) that it has no power to do under its enabling statute. That decision is inapplicable here because the Secretary of the Interior has, and for many years has exercised, broad authority to manage the O & CLA lands; the BLM is steward of these lands, not merely a regulator. Management under O & CLA must look not only to annual timber production but also to protecting watersheds, contributing to economic stability, and providing recreational facilities. 43 U.S.C. § 1181a.

Forty threatened or endangered species may be found within the range of the northern spotted owl; of these, about half use coniferous forest habitat on federal lands. FSEIS at S–6. About three hundred species within the owl's range are listed, proposed, petitioned, or deemed candidates for listing under ESA. FSEIS, App.G, FWS Biological Opinion at 2. The ROD states, in regard to complying with both O & CLA and ESA:

> One of the purposes of the Endangered Species Act is the preservation of ecosystems upon which endangered and threatened species depend. A forward-looking land management policy would require that federal lands be managed in a way to minimize the need to list species under the ESA. Additional species listings could have the effect of further limiting the O & C Lands Act's goal of achieving and maintaining permanent forest production. This would contribute to the economic instability of local communities and industries, in contravention of a primary objective of Congress in enacting the O & C Lands Act. That Act does not limit the Secretary's ability to take steps now that would avoid future listings and additional disruptions.

ROD at 50; *see also* FSEIS at F–114–115.

"An agency's construction of the laws it administers is accorded considerable weight." *Pyramid Lake,* 898 F.2d at 1414. The management decision made here in regard to the O & CLA lands was a lawful exercise of the Secretary's discretion. If this ruling were to be reversed on appeal, the ROD would have to be reconsidered because of the loss of important LSOG and riparian reserves.

### D. *FLMPA "Withdrawal" Provision*

■ NFRC has pleaded a claim that the designation of late-successional and riparian

reserves on BLM lands violates FLPMA, which requires congressional approval of a "withdrawal" exceeding 5,000 acres. 43 U.S.C. § 1714(c). FLMPA defines "withdrawal" as "withholding an area of federal land from settlement, sale, location, or entry, under some or all of the general land laws...." 43 U.S.C. § 1702(j). As stated in *Sagebrush Rebellion, Inc. v. Hodel,* 790 F.2d 760, 761 n. 1 (9th Cir.1986):

> A withdrawal withholds an area of federal land from sale, lease or use under the general land laws (which authorize and regulate the transfer of federal lands to the private domain) in order to preserve a public value in the area or for a public purpose. *Cf.* 43 U.S.C. § 1702(j) (1982).

In *Sagebrush Rebellion* the Secretary was proposing to withdraw an area from the operation of federal land and mining laws. The present action is not of that nature; it is merely an exercise of the Secretary's multiple-use planning responsibilities. FLPMA itself calls for the "designation and protection of areas of critical environmental concern." 43 U.S.C. § 1712(c). The multiple-use plan adopted here does not require congressional approval under FLPMA.

### E. *Organic Administration Act*

█ NFRC has pleaded a claim that the plan's adoption violates a provision of the Organic Administration Act, adopted in 1897, that

> [n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States....

16 U.S.C. § 475.

Congress's management directions for the national forests have been given in later statutes, primarily MUSY, NFMA, and ESA. The 1897 Act does not provide an exhaustive list of forest uses, and this claim by NFRC has no merit.

### F. *Viability Regulation*

█ The parties challenging the ROD and FSEIS are at odds over whether the "viability regulation" is lawful and whether the Secretaries have validly applied it.

NFMA directs the Secretary of Agriculture to issue regulations to "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." 16 U.S.C. § 1604(g)(3)(B). Under this delegation of authority the Secretary promulgated the viability regulation, which states in part that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area." 36 C.F.R. § 219.19.

NFRC contends that the regulation is invalid under the multi-use provisions of MUSY and NFMA. All other parties support the regulation's legality.

MUSY defines forest products and services as including "outdoor recreation, range, timber, watershed, and wildlife and fish." 16 U.S.C. § 528. It recognizes that "some land will be used for less than all of the resources." 16 U.S.C. § 531(a). NFMA requires "diversity of plant and animal communities." Diversity, of course, can exist only if individual species survive.

The viability regulation declares that its purpose is to protect viable populations of existing species. 36 C.F.R. § 219.19. It directs the Forest Service to select and monitor indicator species to evaluate the impact of management decisions. 36 C.F.R. § 219.19(a)(1)–(6). It requires that each forest plan alternative set goals for managing indicator species' habitat in a manner "consistent with overall multiple use objectives." 36 C.F.R. § 219.19(a). This last provision, and several others in the regulations, make clear that planning for species diversity occurs with multiple use principles in mind. *See, e.g.,* 36 C.F.R. § 219.27(a)(6) (all management prescriptions shall "provide that habitat for species chosen under § 219.19 is maintained and improved to the degree consistent with multiple-use objectives estab-

lished in the plan"); 36 C.F.R. § 219.26 (forest planning to provide for diversity consistently with multiple use objectives); 36 C.F.R. § 219.27(a)(5) (forest plans should "maintain diversity of plant and animal communities to meet overall multiple-use objectives.")

When a statute authorizes an agency to issue legislative regulations, "Congress entrusts to the Secretary, rather than the courts, the primary responsibility for interpreting the statutory term." *Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Regulations thus adopted have "legislative effect" and are "entitled to more than mere deference or weight." *Id.* at 425–26, 97 S.Ct. at 2405–06.

The viability regulation in all respects is consistent with NFMA and with multiple-use management. *See Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. at 1489.

■ NFRC contends that the Secretary of the Interior could not lawfully use the viability rule as a benchmark in managing BLM lands. In this regard the ROD states:

Although NFMA regulations apply to lands administered by the Forest Service, the fish and wildlife resource regulation was used as a criterion in the development of the alternative we select today, which includes direction for management of BLM lands. Use of the regulation's goals in developing alternatives applicable to BLM lands served the important policy goal of protecting the long-term health and sustainability of all of the federal forests within the range of the owl and the species that inhabit them. This is in accordance with direction and authority provided in the Multiple–Use Sustained–Yield Act, the Federal Land Policy and Management Act, the Oregon and California Lands Act, and the Endangered Species Act.

ROD at 44.

The Secretary of the Interior has not acted contrary to law in deciding to manage the BLM forests so as to preserve viable populations of vertebrate species.

■ In applying the regulation here, the Secretaries have found that "this decision satisfies the requirements of the statute and its implementing regulations because it will provide an amount and distribution of habitat adequate to support the continued persistence of vertebrate species in the planning area." ROD at 45. They base this on findings by FEMAT and the FSEIS assessment team that Alternative 9 would provide an 80% or better likelihood of providing habitat supporting viable populations of all vertebrate species save three. *See, e.g.,* FSEIS at 3 & 4–174, 179, 184, 188, and 197. (The exceptions are three salamander species as to which no higher rating was possible because two exist almost exclusively on nonfederal land and the other inhabits only an area of several acres.)

The Secretaries did not act arbitrarily or capriciously in making their findings. Plaintiffs are correct that the viability regulation requires the agencies to look to species populations—not merely to habitat for hypothetical populations. In *Seattle Audubon Soc'y v. Evans* the Ninth Circuit has found that "the regulation establishes as its purpose management of the forest to maintain a 'viable population' of existing species." 952 F.2d at 299–300, *quoting* 36 C.F.R. § 219.19; *see also Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. at 1489. Given the current state of scientific knowledge, populations were adequately considered. *See, e.g.,* FSEIS at 3 & 4–211–237.

■ NFRC contends that the viability only of vertebrates, not of invertebrate species, can be considered. The ROD states:

By its own terms, the regulation applies only to vertebrate species. Nevertheless, consistent with the statutory goals of providing for diversity of plant and animal communities and the long-term health of federal forests, as well as the agencies' conservation policies, our decision satisfies a similar standard with respect to nonvertebrate species to the extent practicable.

ROD at 44.

The federal defendants were bound by law, and by the obvious fact of species interdependence, to consider the survival prospects of species other than vertebrates. Their chosen

method of doing so was within the legitimate scope of their discretion.

## X. PROCEDURAL CHALLENGES

### A. *NFMA Forest Plan Amendment Procedures*

■ The ROD amends the planning documents for nineteen national forests and seven BLM districts. ROD at 1. NFRC contends that the Forest Service failed to comply with forest plan amendment procedures required by NFMA, 16 U.S.C. § 1604(f)(5), and the implementing regulations at 36 C.F.R. §§ 219.11 and 219.12.

Forest planning in two stages—the overall plan and the specific project—has been approved by the courts, *see Idaho Conservation League v. Mumma*, 956 F.2d at 1511–12, and *Portland Audubon Soc'y v. Lujan*, 795 F.Supp. at 1491–92, and is reflected in the regulations and policy directives of the agencies. Forest Service Manual 1922, 53 Fed. Reg. 26807, 25809 (July 15, 1988) (Forest Service); 43 C.F.R. 1601.0–2; 43 C.F.R. 1601.0–5(k); 43 C.F.R. 1610.5–3(a) (BLM).

The FSEIS states:

The requirements for a significant amendment to a Forest Plan have been met because the process used in the development of the FEMAT Report and the SEIS incorporates all the elements of the general planning process, including identification of the purpose and need and planning criteria, data inventory and collection, analysis of the management situation, formulation of alternatives, estimation of effects and evaluation of the alternatives, comparison of the alternatives, identification of the preferred alternative, and development of monitoring requirements. In addition, the Final SEIS is based, in part, on public comment generated during and after the April 2, 1993, Forest Conference, and on the more than 100,000 comments received during the public comment period for the Draft SEIS. Thus, public involvement and disclosure requirements of both NFMA and NEPA have been met for the signifi-

cant amendments to the existing Forest Plans.

FSEIS at F–111.

The ROD states that certain procedural features of the NFMA planning regulations are deferred until the time of individual forest plan revision. ROD at 47–48. The Secretaries may properly divide the planning process in this way. *See Mumma*, 956 F.2d at 1522–23. To require that planning be done *only* on an individual forest basis would be unrealistic.

### B. *NEPA—Basic Standards*

■ The plaintiffs and NFRC challenge the adequacy of the FSEIS under NEPA. An environmental impact statement serves two purposes: to provide the decision-makers with useful information, and to give the public a chance to participate in gathering information. *Oregon Natural Resources Council v. Marsh*, 832 F.2d 1489, 1492–93 (9th Cir.1987), *rev'd on other grounds*, 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). In judicial review,

"[t]his circuit employs a 'rule of reason' that asks whether an EIS contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. A reviewing judge must make a pragmatic judgment whether the EIS's form, content and preparation foster both informed decision-making and informed public participation.... Once satisfied that a proposing agency has taken a 'hard look' at a decision's environmental consequences, the review is at an end."

*Resources Ltd., Inc. v. Robertson*, 8 F.3d 1394, 1400 (9th Cir.1993), *quoting Idaho Conservation League v. Mumma*, 956 F.2d at 1519.

■ The detail required of an EIS depends on the nature and scope of the proposed action. *Northwest Coalition for Alternatives to Pesticides v. Lyng*, 844 F.2d 588, 592 (9th Cir.1988); *California v. Block*, 690 F.2d 753, 761, 765 (9th Cir.1982). When a programmatic EIS is involved, as here, site-specific impacts may be analyzed later. *Resources Ltd.*, 8 F.3d at 1401.

■ It is not required that every conceivable impact be analyzed, or that action be deferred until all studies have been done that might be done. *State of Alaska v. Andrus*, 580 F.2d 465, 473–74 (D.C.Cir.1978), *vacated in other part sub nom., Western Oil and Gas Ass'n v. Alaska*, 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978). An EIS must, however, candidly disclose the risks and any scientific uncertainty. *Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. at 1479; *Seattle Audubon Soc'y v. Espy*, 998 F.2d at 704. It must also disclose responsible scientific opinion in opposition to the proposed action, and make a good faith, reasoned response to it. *Seattle Audubon Soc'y v. Moseley*, 798 F.Supp. at 1479; *California v. Block*, 690 F.2d at 773.

### C. *NEPA—Agency Objectivity*

■ An agency's actions have been held "not viable if the proof discloses that the agency proceeded to perform its environmental tasks with less than 'good faith objectivity.' " *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1129 (5th Cir.1974). This does not, however, preclude the agency from choosing an option that it preferred from the beginning. *Id. See also Life of the Land v. Brinegar*, 485 F.2d 460, 467 (9th Cir.1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■ NFRC argues that the ROD cannot stand because Alternative 9 was prejudged as acceptable. It points to statements praising the option—even announcing it as "the plan"—by the President and the Secretaries before the FSEIS was issued and subjected to public comment.

■ The regulations require the Forest Service and BLM to designate a preferred alternative before the public comment period. 43 C.F.R. § 1610.4–7; 36 C.F.R. § 219.12(i). This was done here with more drum-beating than usual—inevitably, given the high level of public interest. Government officials, however, are presumed to have acted in good faith, *see Hoffman v. United States*, 894 F.2d 380, 385 (Fed.Cir.1990); and beyond the presumption, the record here shows that in fact they did.

The early preference for Alternative 9 was not final. A thorough and fair analysis of the ten alternatives was made; all views were considered; and the final decision-making authority remained with the agencies. *See Nehmer v. United States Veterans' Admin.*, 712 F.Supp. 1404, 1414–15 (N.D.Cal.1989). The Secretaries modified Alternative 9 before they issued the ROD. The "good faith objectivity" requirement was satisfied.

NFRC also contends that the presence of George Frampton as Assistant Secretary of the Interior vitiates the process. Mr. Frampton formerly was president of the Wilderness Society. The latter, as a plaintiff, now *opposes* approval of the ROD and FSEIS. It is common for assistant secretaries to have worked earlier in the relevant industry on one side or the other. The mere reference to Assistant Secretary Frampton as having been involved is not enough to warrant invalidating the plan or ordering him to testify at a deposition. *Lead Industries Assn., Inc. v. EPA*, 647 F.2d 1130 (D.C.Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 621, 66 L.Ed.2d 503 (1980), the only case cited by NFRC, is not to the contrary.

### D. *NEPA—Use of FEMAT Report*

■ Agencies may not delegate the responsibility of preparing an EIS to private parties; they must "independently evaluate the information submitted and shall be responsible for its accuracy." 40 C.F.R. § 1506.5(a); *Life of the Land v. Brinegar*, 485 F.2d at 467. Outside work, if used, need not be redone but must be "verified by the agency." 40 C.F.R. § 1506.5(a). NFRC argues that the Secretaries abandoned these duties and adopted the FEMAT report uncritically.

*Life of the Land*, however, shows that where federal agencies have "significantly participated in a joint federal/non-federal environmental analysis, the agencies may rely on the resulting EIS without independent verification." 485 F.2d at 467–68. FEMAT was composed mostly of federal employees and its chairman was a Forest Service biologist. And even if a further critical review was required, it was adequately done. FEMAT's work was subjected to peer review

and to analysis by the FSEIS team and a scientific advisory group, each composed entirely of federal employees.

■ Courts generally defer to the agency's choice of methodology to conduct a NEPA analysis unless the choice is so flawed that it has resulted in a failure to address some factor, " 'consideration of which was essential to a truly informed decision....' " *Inland Empire Public Lands Council v. Schultz*, 992 F.2d 977, 981 (9th Cir.1993), *quoting Foundation for N. Am. Wild Sheep v. United States Dept. of Agriculture*, 681 F.2d 1172, 1178 (9th Cir.1982). The present record would not justify an exception to that rule.

### E. *NEPA—Range of Alternatives Considered*

■ NEPA requires that an agency consider a reasonably full range of alternatives. As stated in *Resources Ltd.*, 8 F.3d at 1401–02:

> The "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Mumma*, 956 F.2d at 1519 (citation omitted). An agency's consideration of alternatives is adequate "if it considers an appropriate range of alternatives, even if it does not consider every available alternative." *Headwaters, Inc. v. Bureau of Land Management*, 914 F.2d 1174, 1180–81 (9th Cir. 1990).

> \* \* \* \* \* \*

Alternatives that are unlikely to be implemented need not be considered, nor "must an agency consider alternatives which are infeasible, ineffective, or inconsistent with the basic policy objectives for the management of the area." *Headwaters*, 914 F.2d at 1180.

The Council on Environmental Quality NEPA regulations required the impact statement to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decision-maker and the public." 40 C.F.R. § 1502.14. The discus-

sion must "[i]nclude the alternative of no action." 40 C.F.R. § 1502.14(d).

Here, a no-action alternative based on plans in existence several years ago, but not implemented because of court rulings, was considered but not selected for intensive analysis. *See* FSEIS at 2–19–21. The ROD at 24–25 states:

> For both BLM and the Forest Service, the no-action alternative consists of management direction and plans in place immediately before the release of the Interagency Scientific Committee's *A Conservation Strategy for the Northern Spotted Owl*. As considered in the Final SEIS, the no-action alternative is the same as that described in the Environmental Impact Statements that the Final SEIS supplements, and is consistent with Council on Environmental Quality (CEQ) requirements to present "no change" from current management direction or level of management intensity. However, because of the listings of the marbled murrelet and the northern spotted owl as "threatened", concern over declining fish stocks, and other recent information regarding the habitat for other late-successional forest related species, the no-action alternative is no longer biologically or legally feasible. It does not meet the requirements of the Endangered Species Act or the National Forest Management Act. Additional discussion, including the rationale for not further considering the no-action alternative, is included in Chapter 2 of the Final SEIS.

■ NFRC contends that the no-action alternative was required to be among those chosen for final analysis.

■ The Secretaries' treatment of the no-action alternative was deemed sufficient by general counsel for the CEQ, who advised by letter that further consideration was unnecessary because no-action did not constitute a reasonable alternative under 40 C.F.R. § 1502.14(a). FSEIS App.C. CEQ's interpretation of NEPA is entitled to deference. *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). The same is true of an opinion by CEQ's general counsel. *See Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1246–47 (D.C.Cir.1980).

■ The Secretaries acted within the scope of their authority in analyzing the no-action alternative only briefly because legal rulings and recently-acquired biological information made it not feasible. An agency may modify a no-action alternative where a continuation of the existing plan would be unlawful. *Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1453–54 (9th Cir.1984). Among the options given full consideration and analysis was Alternative 7, which the agencies found was the plan that probably would have emerged if earlier management efforts had proceeded without new direction.

■ The remaining question in this regard is whether the federal defendants considered a wide enough range of alternatives. NFC, FCC, and Save the West contend that the agencies erred in failing to consider a no-harvest alternative, i.e., one that would bar all further timber sales in owl habitat areas. NFRC contends that alternatives proposed by it should have been considered or at least more fully discussed: a "landscape management approach" and a "long-rotation timber harvest" theory, which would eliminate or greatly reduce the forest reserves.

At both ends of the spectrum, these arguments cannot be sustained.

Alternative 1 would protect "essentially all existing old growth forests." ROD at 20. It was fully considered.

The approaches favored by NFRC were discussed and found to be inadequate. A non-reserve strategy was rejected for in-depth consideration because it rated low on biological criteria. ROD at 18. The need for reserves is fully explained. The FWS in its biological opinion stated that the reserves "are particularly important contributions to the conservation of the spotted owl and marbled murrelet." FSEIS, App. G, Biological Opinion at 3. FWS stressed the importance of the strategy's "approach to ecosystem management and its benefits to listed species." *Id.* The FSEIS notes that "[e]xtensive studies of the owl during the last 20 years have shown it to be strongly associated with late-successive forests throughout much of its range." FSEIS at 3 & 4–211. The ROD concludes:

Given the limited amount of late-successional and old-growth forest presently within the range of the northern spotted owl at this time, it would not be prudent or reasonable to apply the active landscape management approaches suggested by the "constant change" theorists to the majority of the remaining late-successional and old-growth forest stands across the federal landscape.

ROD at 65.

Elements of NFRC's favored approaches can be tried in the adaptive management areas. The Secretaries were not required by NEPA to select them as finalists for the over-all plan.

The ten alternatives analyzed in depth span a variety of measures and strategies and an eighteen-fold difference among probable average annual timber sale levels. In a programmatic EIS of this magnitude an almost infinite number of variations could be devised. The process followed here included initial consideration of dozens of alternatives followed by intensive scrutiny of ten; the latter group fulfilled the requirement that the agency "set forth only those alternatives necessary to permit a reasoned choice." *Headwaters,* 914 F.2d at 1180, *quoting California v. Block,* 690 F.2d at 767.

## F. *NEPA Compliance—Northern Spotted Owl*

■ The Secretaries have found that any approach—even stopping all human activities in the planning area—would entail some risk that species will go extinct. ROD at 44. They have found also that Alternative 9 as modified "will provide an amount and distribution of habitat adequate to support the continued persistence of vertebrate species in the planning area" and "will not jeopardize the continued existence of any listed species under the Endangered Species Act." ROD at 45. The FSEIS summarizes viability ratings showing an 80% or greater likelihood that Alternative 9 will provide sufficient habitat for well-distributed populations of northern spotted owls on the federal lands. FSEIS at 3 & 4–243. (A similar finding is made for the marbled murrelet. *Id.*)

The plaintiffs contend that in reaching the owl viability finding the FSEIS and ROD fail adequately to discuss and consider opposing scientific views to the effect that *any* further loss of habitat is unduly risky. The adopted strategy calls for a shrinkage of habitat, over decades, followed by an expansion and stabilization. Pointing to demographic data that suggest an accelerating population decline, some scientists urge that the risk of the transition period should not be taken.

The dissenting scientists argue persuasively, and there is no doubt that excessive logging and development have brought the spotted owl, and other species sharing its habitat, to a perilous point. But there is reputable scientific opinion supporting the Secretaries' view. The FSEIS, at 3 & 4–229–235, discusses the problem at length; finds that "[t]he basis for believing that owl populations have passed, or will soon pass, some threshold is not strong" (FSEIS at 3 & 4–234); and gives reasons for believing that the strategy will succeed. The ROD points to the views of scientists who, having considered the objectives, "take the view that strong reasons exist to believe that owl populations will stabilize widely distributed across federal lands under our decision." ROD at 71.

■ The plan must be designed by the agencies, not by the courts. The question for judicial review is whether NEPA's requirements have been met. A disagreement among scientists does not in itself make agency action arbitrary or capricious, nor is the government held to a "degree of certainty that is ultimately illusory." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1336 (9th Cir.1992).

The agencies have engaged in numerous studies and analyses, including some requested by plaintiffs, to evaluate effects on the owl and its habitat. The FSEIS does take a "hard look" at the available data and opposing opinions. There is reasoned discussion of a myriad of factors.

The ROD lists the "best available information" that was used, and concludes:

Notwithstanding the prodigious amount of data reflected in the Final SEIS's analysis, we acknowledge that there is less than perfect information about many of the relationships that lie at the heart of the effects assessment. Nevertheless, we find that there is sufficient information to allow us to make a reasoned choice among the alternatives.

ROD at 41–42.

Careful monitoring will be needed to assure that the plan, as implemented, maintains owl viability. New information may require that timber sales be ended or curtailed. But on the present record, the FSEIS adequately discloses the risks and confronts the criticisms as required by NEPA.

## G. *NEPA—Compliance as to Aquatic Species*

■ For opposite reasons, the plaintiffs and NFRC challenge the aquatic species conservation strategy ("ACS") described in the plan.

Many fish populations are at risk due in part to habitat loss in the forests. Among these are anadromous fish prized for commerce and sport. A FEMAT panel, the Aquatic/Watershed Group, was charged with analyzing aquatic subsystems and developing a region-wide strategy. It developed, and the ROD eventually adopted, an ACS based on four elements described as follows in the FSEIS:

◆ Riparian Reserves to maintain ecological functions and protect stream and riparian habitat and water quality.

◆ A network of 164 Key Watersheds with management restrictions to protect at-risk fish stocks (143 Tier 1 Key Watersheds) or basins with outstanding water quality (21 Tier 2 Key Watersheds). No new roads will be constructed in any inventoried roadless areas in Key Watersheds to prevent further sedimentation and changes in hydrology due to the increased road network.

◆ Watershed analysis, which is an analytical procedure used to support planning further protection or management (including restoration practices within a basin).

◆ Watershed restoration to speed ecosystem recovery in areas of degraded habitat and to prevent further degradation.

FSEIS at 3 & 4–192.

The Secretaries have found that the ACS "would result in an eighty percent or greater likelihood of providing sufficient aquatic habitat to support stable, well-distributed populations of the seven salmonid races/species/groups evaluated." FSEIS at 3 & 4–196. The riparian reserves established are the same as in Alternative 1, the environmentally preferred alternative. The ACS includes the most protective standards and guidelines developed by the FEMAT aquatic group.

The National Marine Fisheries Service has opined by letter that the plan will not adversely affect the four anadromous fish species within the range of the northern spotted owl that are currently listed as threatened or endangered. FSEIS, App. G, Part 2.

The plaintiffs contend that the FSEIS's treatment of aquatic species is defective under NEPA in failing to discuss scientific data, answer opposing views, and recognize the experimental nature of the ACS. NFRC argues that the ACS is unjustified in the first place, and that the FSEIS fails to answer the views of a fisheries biologist who discounts forest habitat as a factor in restoring salmon runs.

The FSEIS describes hundreds of at-risk fish stocks. It discusses the problems of management in several places including a thirteen-page section devoted to aquatic species. FSEIS 3 & 4–190—3 & 4–203. It lists the main factors causing fish decline, most of which are outside the forests. *Id.* at 3 & 4–190. It adopts a "habitat-based approach to maintaining and restoring aquatic and riparian habitats and watersheds on federal lands within the range of the northern spotted owl." *Id.* at 3 & 4–82. The FSEIS adequately confronts the risks and uncertainties, and arrives at a reasoned outcome, in compliance with NEPA. *See Northern Alaska Environmental Center v. Lujan,* 961 F.2d 886 (9th Cir.1992).

NFRC's contention that its views were ignored, and that no scientific basis for the ACS has been shown, is not borne out by the record. The FSEIS recognizes that multiple factors are at work. The decision documents cite studies showing that fresh water habitat degradation has adversely affected anadromous fish survival and propagation. The contentions of NFRC and other industry representatives are adequately discussed and answered, and the decision that forest habitat protection must be provided for aquatic species is reasonable.

The effectiveness of the ACS is still subject to debate among scientists. If the plan as implemented is to remain lawful the monitoring, watershed analysis, and mitigating steps called for by the ROD will have to be faithfully carried out, and adjustments made if necessary.

## H. *NEPA—Incomplete Information*

▉▉▉ NFC, FCC, and Save the West contend that the information upon which the agencies relied is incomplete and that the FSEIS fails to deal with this satisfactorily. The CEQ regulations require that where effects information is incomplete or unavailable, the agencies acknowledge that, state the relevance of the missing information, summarize the scientific evidence available, and evaluate the potential impacts "based upon theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22.

The FSEIS acknowledges in several places that information is incomplete. By way of summary it states at 3 & 4–3:

There is less than complete knowledge about many of the relationships and conditions of wildlife species, forests, the economy, and communities. The ecology, inventory, and management of large forests is a complex and developing discipline. The biology of the specific species prompts questions about population dynamics and habitat relationships. The interaction among resource supply, the economy, and rural communities is also the subject of an inexact science.

Chapter 3 & 4 (322 pages in length), entitled "Affected Environment and Environmental Consequences," contains, as to each

type of environmental effect, discussion adequate to satisfy the regulations.

These plaintiffs contend also that a comprehensive quantitative population viability assessment of the spotted owl should be conducted. The FSEIS explains why such an assessment was not considered feasible. The explanation given satisfies the requirements of the regulations. *See Seattle Audubon Soc'y v. Moseley,* 798 F.Supp. at 1493. The agencies have concluded that "there is sufficient information to allow us to make a reasoned choice among the alternatives." ROD at 42. That determination was not in violation of law. *See Greenpeace Action v. Franklin,* 14 F.3d at 1336.

## I. *NEPA—Cumulative Impacts*

■ Agencies are required to examine in an EIS the cumulative impacts of proposed actions, i.e., those that result from the incremental impact of the action when added to the past, present, and reasonably foreseeable future actions regardless of what agency (federal or nonfederal) undertakes them. 40 C.F.R. § 1508.7. Purely hypothetical cumulative impacts need not be evaluated. *Headwaters, Inc. v. BLM, Medford Dist.,* 914 F.2d at 1181–82. The plaintiffs contend that this requirement has not been met as to the owl and other species.

■ Where a programmatic EIS is being considered, a court will not require consideration of nonfederal cumulative impacts in the EIS if the agency will analyze such impacts before specific projects are undertaken. *Resources Ltd.,* 8 F.3d at 1400–01. Nevertheless, cumulative effects, including those in federal forests, those on nonfederal land, and those arising from nonfederal actions, are discussed in a six-page section of the FSEIS (at 3 & 4–4–10) and elsewhere in the document. The discussion is adequate for purposes of this programmatic EIS; cumulative impact analysis will be made for site-specific actions including timber sales.

Plaintiffs complain of an instruction to FEMAT panelists to "[a]ssume conditions other than habitat on federal land are adequate to provide for well-distributed, stabilized populations." This has been explained as follows in the FSEIS:

> The intent of this direction was not to ignore possible problems resulting from cumulative effects, or to make the assumption that viable populations of species could be supported by nonfederal lands alone. Rather, it was designed to cause panelists to initially think, to the extent practicable only about the degree to which federal habitat itself could be expected to support stable, well distributed populations on federal lands. Thus, except as otherwise explicitly noted, this assumption had the practical effect of marginalizing or rendering essentially immaterial the degree and nature of a contribution of nonfederal lands to panel ratings. If the assessment ratings instead had been designed to evaluate habitat on all lands regardless of ownership, it would have been difficult, if not impossible, to determine the benefit expected to accrue to some species or species groups from habitat provided on federal lands under each of the alternatives.

FSEIS, App. J3–1.

Cumulative impacts were adequately considered in compliance with NEPA.

## J. *NEPA—Commitment of Resources*

■ NEPA at 42 U.S.C. § 4332(2)(C)(v), and the implementing regulations, require that an FSEIS consider "any irreversible or irretrievable commitment of resources" involved in the proposed action. NFC claims this requirement has not been met. The FSEIS, however, explains that some remaining old growth forest stands would be logged under the plan, while the bulk would not be, and sets forth the irretrievable results in terms of ecological values, human values, and timber availability. FSEIS at 3 & 4–321. The requirement has been met.

## K. *NEPA—Mitigation Measures and Monitoring*

■ Plaintiffs contend that the FSEIS does not adequately deal with mitigation measures. An agency must discuss mitigation measures in the EIS, and must explain why recommended measures were rejected. 40 C.F.R. §§ 1505.2(c), 1502.14(f); *Robertson*

*v. Methow Valley Citizens Council,* 490 U.S. 332, 352, 109 S.Ct. 1835, 1847, 104 L.Ed.2d 351 (1989).

The FSEIS includes important mitigation measures, adopted in the ROD. The explanation of why other measures were not deemed necessary or practical is adequate. *See* ROD at 29–33.

■ Plaintiffs also challenge the adequacy of the monitoring provisions. The CEQ regulations provide that, to implement a decision, an agency may allow for monitoring and "should do so in important cases." 40 C.F.R. § 1505.3.

The plan includes monitoring for implementation, verification as to results, and validation as to the underlying assumptions. The monitoring program is described above in section V. As written it is legally sufficient. It remains, of course, to be carried out. Monitoring is central to the plan's validity. If it is not funded, or not done for any reason, the plan will have to be reconsidered.

**L. *NEPA—Disclosure as to Water Quality, Air Quality, and Climate Change***

■ NFC contends that the FSEIS fails to disclose adequately the impacts of timber harvest on water quality, air quality, and climate. The FSEIS, however, discusses these ecological impacts at length. *See, e.g.,* FSEIS at 2–70–72 and 3 & 4–83–113. The analyses are general due to the programmatic nature of the FSEIS. The discussion complies with NEPA and the regulations.

**M. *NEPA—Economic Effects***

The plaintiffs claim that the assessment of economic effects in the FSEIS and ROD is fatally flawed.

■ NEPA requires, where economic analysis forms the basis of choosing among alternatives, that the analysis not be misleading, biased, or incomplete. *See Johnston v. Davis,* 698 F.2d 1088, 1094 (10th Cir.1983); *Oregon Natural Resources Council v. Marsh,* 832 F.2d at 1499. To present a full and unbiased picture of proposed alternatives, the EIS must disclose both benefits and costs. *See California v. Block,* 690 F.2d

at 764. In a programmatic EIS, however, NEPA does not require a particularized assessment of nonenvironmental impact. *Mumma,* 956 F.2d at 1522–23.

The FSEIS here discusses at length the economic and social consequences of the plan. *See, e.g.,* FSEIS at 3 & 4–260–319. It estimates the numbers of jobs affected at the different harvest levels, and states:

> Reductions in the amount of timber sold for harvest directly affect employment and the economic health of the forestry and wood products industries. These, in turn, immediately affect the economic vitality of the communities dependent on them, and the well being of workers and families. These changes threaten the ability of some of these communities and their institutions to survive.

FSEIS at S–6.

The FSEIS also recognizes that standing forests make an economic contribution. Based upon the FSEIS analysis, the ROD concludes:

> Alternative 9 in the Final SEIS is the best alternative for providing a sustainable level of human use of the forest resource while still meeting the need to maintain and restore the late-successional and old-growth forest ecosystem.

ROD at 26–27.

■ The plaintiffs contend that the economic effects analysis is skewed in that it exaggerates the negative effects of lower timber harvest and fails to quantify the positive effects. They cite *Sierra Club v. Sigler,* 695 F.2d 957, 979 (5th Cir.1983), for the proposition that the agency "cannot tip the scales of an EIS by promoting possible benefits while ignoring their costs."

Here, the agencies have not ignored the costs. The drawbacks of allowing any further timber harvest are mentioned repeatedly in the FSEIS; so are the costs of minimizing harvests. Plaintiffs rely upon a methodology developed by two economists to quantify the economic benefits of maintaining unlogged forests. While recognizing such benefits, the Secretaries have found that they are hard to quantify. The ROD includes the

following comment on the views advanced by plaintiffs:

> Economists use a variety of assumptions to predict economic impacts of a proposed action. The Final SEIS uses a traditional forest resource approach to evaluate alternatives. The commenters prefer to use an approach that relies on less quantifiable terms and applies them over a broader regional base. Had we adopted their assumptions, a more positive regional economic impact would have been shown, but the fundamental analysis and assessment of Alternative 9 would not have changed.

ROD at 72.

The views of plaintiffs' economists that the region would be better off economically by forgoing any more old-growth cut are persuasive but subject to debate; the Secretaries did not act unlawfully in declining to adopt them.

**N. *NEPA—Funding***

 NFRC and SAS argue that the FSEIS is defective in failing to disclose what will happen if Congress fails to provide funds to make the plan work. This argument overlooks what the FSEIS and ROD *do* say: that each major part of the plan, including monitoring, will need to be implemented. For example:

> Monitoring is an essential component of natural resource management because it provides information on the relative success of management strategies.

FSEIS at 2–10.

A failure to monitor adequately, due to financial constraints, would call for reconsideration of the plan. NEPA does not require a further statement of the obvious in this regard.

**O. *NEPA—Alleged Deprivation of Public Comment on Changes to FSEIS***

 FCC and Save the West contend that the ROD is invalid because it contains changes from the FSEIS, and no additional comment period was provided. They cite *California v. Block,* 690 F.2d 753 (9th Cir. 1982), holding that NEPA requires not mere-

ly public notice but public participation in the evaluation process. An agency's decision not to do a supplemental EIS, however, will be upheld unless it was arbitrary or capricious. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377–78, 109 S.Ct. 1851, ——, 104 L.Ed.2d 377 (1989). Thus in *Enos v. Marsh,* 769 F.2d 1363, 1373–74 (9th Cir. 1985), an agency's decision not to supplement was held reasonable notwithstanding new developments including a change of nearly fifty percent in the size of a harbor project. In the present case Alternative 9 as adopted in the ROD closely resembles Alternative 9 as set out in the FSEIS. The Secretaries acted within the permissible scope of their discretion in going forward without an additional EIS and comment period.

## XI. CONCLUSION

All claims and arguments asserted by plaintiffs or NFRC have been considered, and none would justify invalidation of the plan or a remand to the agencies.

For the reasons stated, the plaintiffs' motions for summary judgment as to the agency action are denied, and the federal defendants' cross-motions for summary judgment are granted. The motion of the federal defendants in C92–479WD for summary judgment declaring the agency action lawful as against NFRC's claims pleaded in *Northwest Forest Resource Council v. Thomas* and *Northwest Forest Resource Council v. Dombeck* is granted. The latter ruling does not extend to the second and third claims in the *Thomas* and *Dombeck* complaints, as to which no motion was made.

There remains a claim in C92–479WD for an award of attorney fees and expenses, under the Equal Access to Justice Act, 28 U.S.C. §§ 2412(b)˙ and 2412(d)(1)(A), as to the agency action held invalid under NEPA in 1992. In addition, plaintiffs have requested that the court retain jurisdiction for certain purposes. Any motion for relief in these respects will be due on January 19, 1995.

The clerk is directed to send copies of this order to all counsel of record.

1326

APPENDIX A

Table ROD-1. Summary and comparison of land allocations and standards and guidelines among alternatives.

| Alternative | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Congress. Res. | Million acres | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 | 7.321 |
| Late-Successional Reserves | Million acres | 11.402 | 8.951 | 7.359 | 8.066 | 6.376 | 7.501 | 5.423 | 7.501 | 7.431 | 7.501 |
| | Timber harvest/salvage | None | Treatment of stands less than 50 years old. Very limited salvage | Same as Alternative 2 | Treatment of stands and salvage per Northern Spotted Owl Recovery Plan | Same as Alternative 4 | Same as Alternative 2 | Same as Alternative 4 | Treatment of stands in Murrelet Zone 1 up to 50 years. Other stands up to 100 years. | West - Treatment of less than 80 years old. East - Manage to reduce risk of catastrophic loss. | Same as Alternative 2 |
| | Protection for sitka occupied by murrelet outside reserves | Yes | Yes | Yes | Yes | Yes | Yes | No² | No² | Yes | Yes |
| | Protection of SAT species closely associated with old growth | Yes | No | Yes | Yes | Yes | No | No | No | Yes | No |
| Managed Late-Successional Areas or Adaptive Management Areas (Alt. 9 only) | Million acres | 0 | 0 | 1.700 | 0.238 | 0.381 | 0 | 0.381 | 0 | 1.522 (AMA) 0.102 (MLSA) | 0 |
| | Timber harvest/salvage | N/A | N/A | West - Long rotation, 50 percent retention East - Long rotation, or uneven-age management | Treatment of stands and salvage per Northern Spotted Owl Recovery Plan | Same as Alternative 4 | N/A | Same as Alternative 4 | N/A | Adaptive Management Areas and some Managed Late-Successional Areas | N/A |
| Administratively Withdrawn Areas | Million acres | 1.080 | 1.509 | 1.499 | 1.652 | 2.067 | 1.828 | 2.282 | 1.828 | 1.477 | 1.828 |
| Riparian Reserves | Million acres | 1.880 | 2.164 | 2.134 | 2.896 | 2.674 | 2.513 | 0.622 | 1.503 | 2.628 | 2.513 |
| | Widths¹ | 2:1:1 | 2:1:1 in Tier 1 Key Watersheds, 2:1:¼ other watersheds | Same as Alternative 2 | Same as Alternative 1 | Same as Alternative 2 | Same as Alternative 2 | Variable, usually no reserves on intermittent streams¹ | 2:½:¼ | Same as Alternative 1 | Same as Alternative 2 |
| Matrix | Million acres | 2.773 | 4.511 | 4.443 | 4.234 | 5.637 | 5.293 | 8.428 | 6.303 | 3.975 | 5.293 |
| | 50-11-40 | Yes | Yes | Yes | Yes | Yes | Yes | Natl. Forest-Yes BLM-modified | No | No | No |
| | Snag/decay; green trees per acre | 2:2:6 | 2:2:6 | Support 40% pop: West - 12, East - 2:10:4 | Variable on National Forests, BLM - 2:2:6-9 | Same as Alternative 4 | 2:2:6 | Same as Alternative 4 | Same as Alternative 4 | Coastal areas WA/OR: 2:8-12:0 Other areas 2:8-12:15% | 2:2:6 |

¹ Riparian Reserve Widths (e.g., 2:1:1), are expressed as multiples of the height of a maximum site-potential tree, measured on each side of fish-bearing streams, nonfish-b aring streams, and intermittent streams, respectively (see text).

² Not specifically required in the alternative, but currently required under the Endangered Species Act.

Figure ROD-1. First decade probable average annual timber sale levels (PSQ) by historical period and alternative.

1 Region 6 = Pacific Northwest Region
2 Region 5 = Pacific Southwest Region
3 Includes cull, submerchantable material, firewood and other products.

**Table ROD-2.** Historical and projected employment (in thousands of jobs) in the timber industry in the next decade, by state and alternative, within the range of the northern spotted owl. This includes self-employed individuals in the solid wood products and pulp and paper sectors. Wage and salary employment is approximately 7.5 percent less than total employment.

| State | 1990 actual | 1992 (est.) | Alt. 1 | Alt. 2 | Alt. 3 | Alt. 4 | Alt. 5 | Alt. 6 | Alt. 7 | Alt. 8 | Alt. 9 | Alt. 10 |
|-------|-------------|-------------|--------|--------|--------|--------|--------|--------|--------|--------|--------|---------|
| WA | 57.9 | 51.3 | 48.1 | 48.7 | 48.7 | ·48.7 | 48.7 | 48.8 | 48.7 | 49.0 | 48.4 | 48.8 |
| OR | 73.1 | 62.8 | 51.2 | 54.7 | 54.9 | 55.4 | 56.6 | 54.4 | 61.3 | 58.2 | 56.4 | 56.4 |
| CA | 13.9 | 11.3 | 10.2 | 10.6 | 10.7 | 10.6 | 10.7 | 10.8 | 10.8 | 10.9 | 11.1 | 10.9 |
| Total | 144.9 | 125.4 | 109.5 | 114.0 | 114.3 | 114.7 | 116.0 | 114.0 | 120.8 | 118.1 | 115.9 | 116.1 |